UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| |
|---|
| UNITED STATES OF AMERICA *ex rel.* [SEALED], <br><br> Plaintiff, <br><br> - against - <br><br> [SEALED], <br><br> Defendants. |

No.: 1:19-cv-06466 (EK) (CLP)

FALSE CLAIMS ACT
**FIRST AMENDED
COMPLAINT**

**[FILED UNDER SEAL]**


**FILED IN CAMERA AND UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)
DO NOT POST ON ECF
DO NOT PUT IN PRESS BOX**


POLLOCK COHEN LLP
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361

*Counsel for Plaintiff-Relator*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, the STATE of
NEW YORK, and the CITY OF NEW YORK,
*ex rel.* HYUN YU, Pharm.D.,

       *Plaintiff,*

         v.

NUCARE PHARMACY WEST, LLC, THOMAS
WEBSTER, M.D., LEONARD MEGGS, M.D.,
NAHESI LAMBERT-DOORN, M.D., HAFIZULLAH
EBADY, DELA SAIDAZIM, DAVID GARY
BISHOFF, and BRYCEN KAY MILLETT,

       *Defendants.*

No.:  19-cv-6466

FIRST AMENDED
FALSE CLAIMS ACT
COMPLAINT

**[FILED UNDER SEAL]**

---

*Qui tam* plaintiff and Relator Hyun Yu, Pharm.D., through his undersigned

attorneys, hereby brings this action on behalf of the United States of America, the State

of New York, and the City of New York against Thomas Webster, M.D., Leonard Meggs,

M.D., and Nahesi Lambert-Doorn, M.D. (the "Defendant Physicians"), NuCare

Pharmacy West, LLC ("NuCare"), Hafizullah Ebady, Dela Saidazim, David Gary

Bishoff, and Brycen Kay Millett.  The claims asserted in this Complaint are based on

the facts and information set forth below.

## NATURE OF THE ACTION

1.     Relator sues Defendants to recover treble damages and civil penalties on

behalf of the United States of America, the State of New York, and New York City for

their massive fraudulent prescription billing scheme through which they made or

caused the submission of false claims for payment to Medicaid, the New York State

Health Insurance Program ("NYSHIP"), and the UFT Welfare Fund[1] (together hereinafter referred to as "Government Healthcare Programs").

2.      Defendants engaged in these widespread frauds against the United States, the State of New York, and the City of New York in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and the New York False Claims Act, State Fin. Law § 189 *et seq.* ("NYFCA").

3.      Relator is a pharmacist and was hired by Defendant NuCare to supervise NuCare's 250 Ninth Avenue location in Manhattan.

4.      In his role as the supervising pharmacist at this NuCare location, Dr. Yu personally observed millions of dollars of fraudulent prescriptions being written by the Defendant Physicians and billed by NuCare to the Government Healthcare Programs.

5.      In October 2019 *alone*, "Medication Orders" for almost 35,000 medications were submitted to NuCare in the name of these three Defendant Physicians with a retail value totaling more than $100 million.

6.      These "Medication Orders" related to almost 4,000 "patients" from all corners of New York State.  The identical, or near identical, mix of drugs was billed to insurers for all of these purported patients.

---

[1] The UFT Welfare Fund is a City-funded program to provide supplemental benefits to New York City Department of Education employees.  It is separate from, and not commingled with, the funds of the United Federation of Teachers (the teachers' union). And, unlike the union, which is funded by member contributions, the UFT Welfare Fund is *not* funded by members but is instead entirely funded by the City.

2

7.     The drugs would be appropriate for patients suffering from *all* of the following symptoms:  migraine headaches, chronic pain, fungal skin infection, cough, burn injury, skin irritation, scarring, and oral herpes or cold sores.

8.     But it is impossible that the Defendant Physicians collectively examined and diagnosed some 4,000 patients, all with this *same* specific constellation of symptoms in the month of October 2019.

9.     And instead of writing legitimate prescriptions, the Defendant Physicians transmitted unlawful "Medication Orders."

10.     Dr. Yu refused to fill the fraudulent prescriptions, but nonetheless observed through the NuCare computer system that many millions of dollars of false prescription orders and bills were nevertheless submitted to, and paid by, insurers, including various Government Healthcare Programs.

## I.     <u>Parties</u>

### A.     **Relator – Dr. Yu**

11.     Relator Hyun Yu, Pharm.D. resides in Hudson County, New Jersey. He was hired by NuCare to be the supervising pharmacist of the 250 Ninth Avenue location on or about October 15, 2019.

12.     By letter dated November 14, 2019, Relator provided notice to the United States Attorney for the Eastern District of New York and the Attorney General of the State of New York regarding the fraud at issue here.

### B.     **NuCare Pharmacy West, LLC**

13.     NuCare Pharmacy West, LLC is a New York Limited Liability Corporation that regularly conducts business in New York.

3

14.     NuCare is a retail pharmacy with a physical location at 250 Ninth Avenue, New York, New York.

### C.     Dr. Thomas Webster

15.     Dr. Webster is an aerospace medicine and nuclear medicine doctor who appears to practice with Radiologic Associates, PC in Middletown, New York.

16.     Dr. Webster's New York license number is 295776 and his National Provider Identifier ("NPI") is 1154432094.

17.     In October 2019 alone, Dr. Webster ordered nearly 22,000 medications totaling to more than $65 million.

18.     These medication orders all bear Dr. Webster's name but many of the medication orders include NPI numbers associated with other doctors.

### D.     Dr. Leonard Meggs

19.     Dr. Meggs is a nephrologist who appears to practice in New Orleans.

20.     Dr. Meggs owns the residential property located at 2741 Clover Street, Pittsford, New York.

21.     Dr. Meggs's New York license number is 132788 and his NPI is 1265521793.

22.     The National NPI database lists Rochester, New York; Geneva, New York; and Penn Yan, New York addresses for Dr. Meggs's mailing address, primary practice, and secondary practice addresses respectively.

23.     In October 2019 alone, Dr. Meggs ordered medications through NuCare for New York based patients which cost over $35 million.

24.     Like Dr. Webster, many of the medication orders that bear Dr. Meggs's name include the NPI numbers for different doctors.

### E.     Dr. Nahesi Lambert-Doorn

25.     Dr. Lambert-Doorn is a family medicine physician who owns the property located at 934 Glenwood Road, West Hempstead, New York.

26.     Dr. Lambert-Doorn's New York license number is 266817 and his NPI is 1285985911.

27.     In the month of October 2019 alone, Dr. Lambert-Doorn ordered $4.5 million worth of medication through NuCare for New York based patients.

### F.     Hafiz Ebady

28.     Hafiz Ebady was a consultant who on an ad hoc basis directed Relator at NuCare.

29.     On information and belief, Ebady worked directly for and with NuCare's ownership, including, on information and belief, Millett and Bishoff.

30.     On or about June 9, 2021, Ebady was charged with health care fraud and conspiracy to commit wire fraud and health care fraud. The government alleges that Ebady conspired in a scheme to fraudulently bill healthcare benefit programs for fraudulent telemedicine prescriptions.[2]

31.     Ebady's charged conduct in the above-mentioned criminal case arises from the same facts and circumstances alleged here (and previously reported to the government) by Relator.

---

[2] *See United States v. Ebady et al.*, No. 1:21-cr-00564-WFK (E.D.N.Y.).

### G.     Dela Saidazim

32.     On information and belief, Saidazim was a resident of New York.

33.     On information and belief, Saidazim recruited physicians to provide supposed review of prescriptions from telemedicine providers, and conspired with others, including Ebady, to cause NuCare to submit false claims for fraudulent prescriptions.

34.     On or about June 9, 2021, Saidazim was charged with health care fraud and conspiracy to commit wire fraud and health care fraud. The government alleges that Saidazim conspired with Ebady in a scheme to fraudulently bill healthcare benefit programs for fraudulent telemedicine prescriptions.[3]

35.     Saidazim's charged conduct in the above-mentioned criminal case arises from the same facts and circumstances alleged here (and previously reported to the government) by Relator.

36.     On February 16, 2023, Saidazim pleaded guilty to the conspiracy to commit health care fraud.

### H.     Brycen Millett

37.     On information and belief, Millett—also known as "Brett Johnson"—was a resident of Saint George, Utah.

38.     On information and belief, Millett owned and/or directed the operations of multiple call centers, operating at various times in Utah, Russia, and elsewhere.

39.     On information and belief, these call centers owned and/or directed by Millett and others, contacted individuals to offer medications at no cost to the

---

[3] *Id.*

beneficiaries and without any medical exam to determine the medical necessity for the medications.

40.     On information and belief, the call centers owned and/or directed by Millett and others sent some of their fraudulent prescriptions to NuCare, causing NuCare to submit false claims for those medications that were not requested and/or were not medically necessary.

41.     On information and belief, Millett—concealed through straw ownership—was one of the owners of NuCare.

42.     On March 7, 2022, Millett was charged with conspiracy to commit health care fraud. The government alleges that Millett conspired in a scheme to fraudulently bill healthcare benefit programs for fraudulent telemedicine prescriptions.[1]

43.     Millett's charged conduct in the above-mentioned criminal case arises from the same facts and circumstances alleged here and previously by Relator.

## I.     David Bishoff

44.     On information and belief, Bishoff—also known as "Bobby Fischer"—was a resident of Saint George, Utah.

45.     On information and belief, Bishoff owned and/or directed the operations of multiple call centers, operating at various times in Utah, Russia, and elsewhere.

46.     On information and belief, these call centers owned and/or directed by Bishoff and others, contacted individuals to offer medications at no cost to the beneficiaries and without any medical exam to determine the medical necessity for the medications.

---

[1] *United States v. Bishoff et al.*, No. 1:22-mj-00249-TAM, ECF No. 1 (Mar. 7, 2022).

47.     On information and belief, the call centers owned and/or directed by Bishoff and others sent some of their fraudulent prescriptions to NuCare, causing NuCare to submit false claims for those medications that were not requested and/or were not medically necessary.

48.     On information and belief, Bishoff—concealed through straw ownership— was one of the owners of NuCare.

49.     On March 7, 2022, Bishoff was charged with conspiracy to commit health care fraud. The government alleges that Bishoff conspired in a scheme to fraudulently bill healthcare benefit programs for fraudulent telemedicine prescriptions.[5]

50.     On information and belief, Bishoff's charged conduct in the above-mentioned criminal case arises the same facts and circumstances alleged here and previously by Relator.

## JURISDICTION AND VENUE

51.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and the United States is a plaintiff.  This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a) and supplemental jurisdiction over the state law causes of action under 28 U.S.C. § 1367.

52.     The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a).  The Court has personal jurisdiction over Defendants because they regularly transact business within this District.

---

[5] *Id.*

53.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) & (c) because Defendants transact business or are found within this District and a substantial part of the events establishing the alleged claims arose in this District.

54.     This Complaint is not based on a public disclosure as defined in 31 U.S.C. § 3730(e).  Relator sues as the original source of information regarding Defendants' violations of the FCA, given that Relator has direct and independent knowledge of the information on which the allegations are based; and/or knowledge that is independent of and materially adds to any allegations or transactions which may have been publicly disclosed (although Relator knows of no such public disclosure).

55.     Specifically, the information alleged in this Amended Complaint derives from Relator's experiences and observations while he was employed at NuCare's Ninth Avenue location in Manhattan.

56.     Under 31 U.S.C. § 3730(b)(2), this Complaint was filed *in camera* and under seal and shall not be served on the Defendants until the Court so orders.

57.     Pursuant to 31 U.S.C. § 3730(b)(2), contemporaneous with filing the Complaint, Relator will provide the Government with a copy of the Complaint and Relator's written disclosure statement, together with exhibits, of substantially all material evidence and material information in his possession referenced in and/or related to the Complaint.

# FACTS

## II.  Governing Laws

### A.  The Federal False Claims Act

58.  Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to recover losses sustained because of fraud against the United States.

59.  The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval," "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or conspires to do so.  31 U.S.C. § 3729(a)(1).  Any person found to have violated these provisions is liable for a civil penalty, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each such violation, plus three times the damages sustained by the Government.

60.  A defendant acts "knowingly" under the FCA when it: (1) has actual knowledge; (2) acts in deliberate ignorance of the truth or falsity; or (3) acts in reckless disregard of the truth of falsity. It is not necessary to prove a specific intent to defraud. 31 U.S.C. § 3729(b)(1). This Amended Complaint uses "knowing" to describe all three definitions of scienter under in the FCA.

61.  The FCA also broadly defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has tittle to the money or property, that - … is made to a

contractor, grantee, or other recipient if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest…" 31 U.S.C. § 3729(b)(2)(A).

62.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery.  31 U.S.C. § 3730(b).

### B.     The New York State False Claims Act

63.     The New York False Claims Act ("NYFCA") largely mirrors the FCA and similarly imposes liability upon any person who "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval," "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or conspires to do so.  NY State Fin. Law § 189(1)(a)-(c).

64.     Any person found to have violated these provisions is liable for a civil penalty, "as adjusted to be equal to the civil penalty allowed under the federal False Claims Act," plus three times the damages sustained by the State.  NY State Fin. Law § 189(1).

65.     The NYFCA imposes liability where the conduct is "in reckless disregard of the truth or falsity of the information" and clarifies that "no proof of specific intent to defraud" is required.   NY State Fin. Law § 188(3).

66.     Also like the FCA, the New York law broadly defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property that: (i) is presented to an officer, employee or agent of the state or a local government; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to

be spent or used on the state or a local government's behalf or to advance a state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  NY State Fin. Law § 188(1).

67.    The NYFCA also empowers private persons having information regarding a false or fraudulent claim against the State to sue on behalf of the State and to share in any recovery.  NY State Fin. Law § 190(2), (6).

### C.    The Federal Health Benefit  Program

68.    Medicaid is a joint federal-state program that provides healthcare benefits for certain groups: primarily the poor and disabled.  States administer their own Medicaid programs under federal regulations that govern what services should be provided, and under what conditions.  The Centers for Medicare and Medicaid Services ("CMS") monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards.  The federal government provides a portion of each state's Medicaid funding, known as the Federal Medical Assistance Percentage ("FMAP").  The FMAP is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).

69.    At issue here is the New York Medicaid program, which is jointly funded by New York State and the United States; NYSHIP, which is funded by New York State; and the UFT Welfare Fund, which is funded by the City of New York.

### III.    **The Fake Prescriptions Scheme**

#### A.    **Medication Orders in Lieu of Legal Prescriptions**

70.    Beginning in 2006, New York required all prescriptions to be written on an official prescription form (known as an "ONYSRx"), which is recognizable by the distinctive hologram seal and copy-proof paper.  *See* 10 CRR-NY 910.6.

71.    Legal prescriptions are manually signed and the forms must have serial numbers.

72.    Since 2016, with limited exception, all prescriptions must now be written and submitted electronically.

73.    Instead of writing or electronically submitting legitimate and legal prescriptions, the Defendant Physicians submitted "Medication Orders" to NuCare via fax.

74.    Dr. Yu refused to dispense any of the medications listed on a "Medication Order" because the Medication Orders are not written on an ONYSRx and are not legal and valid prescriptions.

75.    However, Dr. Yu observed through the NuCare computer system that NuCare nevertheless billed Government Healthcare Programs for a large number of the unfilled Medication Orders, and the Government Healthcare Programs have in fact paid a substantial volume of these bills.

76.    On information and belief, Defendants Bishoff and Millett, as beneficial owners of NuCare, and Defendant Ebady, as Bishoff and Millett's on-site representative, caused these Medication Order false claims to be submitted by NuCare.

13

77.     On or about October 25, 2019, Ebady told Relator that if Relator was not comfortable processing medication order prescriptions that were not presented on official New York prescription pads, that NuCare would need to "part ways" with Relator.

78.     On or about October 25, 2019, Ebady told Relator that NuCare's ownership group had directed that Relator be fired for expressing discomfort with NuCare's fraudulent prescription scheme.

79.     On information and belief, that "ownership group"—concealed through straw ownership — included Millett and Bishoff.

80.     On information and belief, Defendant Saidazim conspired with Millett, Bishoff, and others in this scheme by, among other things, recruiting doctors to provide Medication Orders and other prescriptions that were submitted to the Government Healthcare Programs.

81.     On or about November 15, 2019, NuCare terminated Relator explicitly because he refused to participate in the fraudulent scheme.

### B.     The Medication Orders

82.     The Medication Orders written by the Defendant Physicians and billed by NuCare are very nearly uniform.

83.     The vast majority of the Medication Orders call for the dispensing of the same mix of very expensive drugs.

84.     The constellation of symptoms for which this mix of drugs would be appropriate includes *all* of the following: migraine headaches, chronic pain, fungal skin

14

infection, GERD (gastroesophageal reflux disease) and related ulcers, cough, burn injury, skin irritation, scarring, *and* oral herpes or cold sores.

85.     Most of the Medication Orders also included muscle relaxants, multivitamins, probiotics, and at least one topical anesthetic.

86.     It is impossible that the Defendant Physicians collectively examined and diagnosed 3,988 patients, *all* presenting with this same specific constellation of symptoms in the month of October 2019.

87.     Indeed, the Defendant Physicians are simply not examining and diagnosing the people for whom they are writing Medication Orders.

88.     Moreover, the medications which are listed on the Medication Orders are generally very expensive versions of sometimes common treatments.

89.     For example, the vast majority of the Medication Orders include Ketoprofen, which is a nonsteroidal anti-inflammatory drug (NSAID) very similar to Ibuprofen (such as Motrin, Advil, and Nuprin) and used to treat the same or similar symptoms.  Unlike Ibuprofen, Ketroprofen is only available by prescription and costs $50 on average for 30 pills.  In contrast, Ibuprofen can be found for less than $5 for 100 pills

90.     Chlorzoxazone, one of the muscle relaxants, retails for more than $2,000.

91.     The cold sore medicine, Sitavig, costs over $1,000 per dose pack, while Genicin Vita-S, one of the multivitamins, costs more than $3,000.

92.     And nearly every "Medication Order" also includes SIL-K 2X5.5 pads, which are used to treat scars and cost around $5,000 at retail.

93.     On information and belief, Defendants Bishoff and Millett, as beneficial owners of NuCare, and Defendant Ebady, as Bishoff and Millett's on-site representative, caused these Medication Order false claims to be submitted by NuCare.

### C.     The Telemarketing Component

94.     Almost immediately after beginning to work for NuCare, Dr. Yu began receiving phone calls from concerned and confused individuals.

95.     These individuals were the putative "patients" and unwitting subjects of the Medication Orders.

96.     These individuals had themselves received calls from unknown telemarketers.

97.     The telemarketers tried to push various medications and medical diagnoses on the "patients," sometimes identifying themselves as (purportedly) calling from the patients' insurance companies.

98.     The telemarketers would seem to read a list of medications and medical conditions and then offer to order medications for the "patients."

99.     Many of the people who received these calls rejected the offered medications, only to later learn that their insurance had nonetheless been billed for the medications anyway.

100.     On or about October 25, 2019, Ebady told Relator that NuCare had ongoing relationships with multiple telemarketing companies engaging in this conduct.

101.     On information and belief, the telemarketing companies Ebady was referring to were those owned and/or directed by Millett and Bishoff, and include those located in Utah, Russia, and elsewhere.

102.    On or about October 29, 2019, Ebady told Relator that NuCare would divide its brick-and-mortar pharmacy operation from its telemarketing-based business, leaving Relator in charge of the brick-and-mortar portion of the business.

103.    Ebady explained that he knew that the telemarketing business was a "gray area" for Relator. Relator understood Ebady intended to conceal some of the fraudulent scheme from Relator—specifically the aspects of the scheme controlled, upon information and belief, by Millett and Bishoff.

a.    *Patient LZ*

104.    For example, Patient LZ received one such phone call and rejected all of the offered medications because LZ did not suffer from any of the associated medical conditions and had not sought and did not need or want the medications.

105.    Nevertheless, the below medications were ordered for LZ by Dr. Webster:

a.    Ketoprofen 25mg;

b.    Oxiconazole Nitrate 1% Cream;

c.    Omeprazole-Bicarb 20-1,100;

d.    Benzonatate 150mg;

e.    Bensal HP 3% Ointment;

f.    Hydrocort Buty 0.1% Lipid;

g.    Lidocaine-Tetracaine 7%-7%;

h.    Chlorzoxazone 250mg;

i.    Entty Spray Emulsion;

j.    SIL-K 2X5.5 Pad;

k.    Sitavig 50mg Buccal Tablet;

l.    Genicin Vita-S;

17

  m. Folic-K;

  n. Calcipotriene 0.005% Ointment; and

  o. Prodigen.

106. In addition, the NuCare computer systems indicate that NuCare billed for Nicazyme on the same date for LZ, although this drug does not seem to appear on the "Medication Order".

  b. *Patient ET*

107. Patient ET had a similar experience.  ET was called by a telemarketer and offered a similar set of drugs, all of which ET rejected.

108. Even though ET had never heard of or interacted with Dr. Meggs, Dr. Meggs wrote a Medication Order for ET that included the below list of drugs:

  a. Oxiconazole Nitrate 1% Cream;

  b. Benzonatate 150mg;

  c. Cyclobenzaprine 7.5mg;

  d. Prodigen;

  e. Bensal HP 3% Ointment;

  f. Hydrocort Buty 0.1% Lipid;

  g. Lidocaine-Tetracaine 7%-7%;

  h. Entty Spray Emulsion;

  i. SIL-K 2X5.5 Pad;

  j. Sitavig 50mg Buccal Tablet;

  k. Genicin Vita-S; and

  l. Folic-K.

109.    In addition, the NuCare computer systems indicate that NuCare billed for the following drugs on the same date for ET, although these drugs do not seem to appear on the "Medication Order":

    a.    Aspirin-Dipyridam ER 25-200mg;

    b.    Nicazyme;

    c.    Metaxalone 800mg;

    d.    Capsaicin 0.025% Cream; and

    e.    Methyl Salicylate 25% Cream.

    c.    *Patient WK*

110.    A similar list of drugs was ordered by Dr. Meggs for patient WK, whose medications were paid by Medicaid.

111.    The below listed medicines were listed on a Medication Order for WK:

    a.    Fenoprofen 400mg;

    b.    Benzonatate 150mg;

    c.    Prodigen;

    d.    Lidocaine-Tetracaine 7%-7%;

    e.    Chlorzoxazone 250mg;

    f.    Sitavig 50mg Buccal Tablet; and

    g.    Genicin Vita-S.

112.    In addition, the NuCare computer systems indicate that NuCare also attempted to bill for the following drugs on the same date for WK, although these drugs do not seem to appear on the "Medication Order":

a.   Folic-K;

b.   Metaxalone 800mg;

c.   Capsaicin 0.025%;

d.   Methyl Salicylate 25%; and

e.   Nicazyme.

**D.   The Prescription Transfer Component**

113.   The Defendants and others also caused false claims to be submitted to Government Healthcare Programs by "transferring" existing prescriptions at other pharmacies to NuCare.

114.   On information and belief, the telemarketing companies owned and/or directed by Millett and Bishoff contacted beneficiaries, offering that their medications would be delivered for free if the patients agreed to transfer to NuCare.

115.   On information and belief, telemarketers at the aforementioned companies faxed doctors' offices to obtain transfers of prescriptions.

116.   On information and belief, in some instances, telemarketers at the aforementioned companies claimed to represent a beneficiary's insurance company when seeking a transfer of a prescription.

117.   Through WhatsApp messages, phone calls, and other methods of communication, Millett—under the alias "Brett Johnson"—directed and supervised Relator in "transferring" prescriptions to NuCare.

118.   On information and belief, Bishoff and Millett, as the owners and/or managers of the telemarketing companies, also directed NuCare to fill prescriptions for patients who did not consent to have their prescriptions transferred to NuCare.

119.     On or about October 15, 2019, Relator received a call from another pharmacy notifying NuCare that a patient had not authorized the patient's prescriptions to be transferred to NuCare. Ebady directed Relator to process the purportedly transferred prescription anyway, claiming that NuCare should process the prescription unless the patients themselves called and directed NuCare not to.

120.     On or about October 30, 2019, Millett told Relator in a text message that Medicare was the "main group" of so-called transfer prescriptions.

121.     On or about November 15, 2019, Relator discussed with Ebady the possibility of reversing certain bad prescription claims. Ebady said NuCare could not do that because it would cause NuCare to be "red flagged" by various insurance companies, and NuCare needed to maintain a large volume of purportedly valid prescriptions to ensure that NuCare does not "show up on the radar" for the insurance companies.

122.     In other words, Ebady and NuCare took numerous steps to conceal the scheme which they knew to be fraudulent in the hopes that insurance companies, CMS, and law enforcement would stop the windfall of profiting off the fraudulent prescriptions.

123.     On information and belief, Ebady acted at all times at the direction of and in coordination with Millett and Bishoff, who owned and/or managed both the telemarketing companies and pharmacies including NuCare.

124.     On information and belief, Defendants submitted or caused to be submitted numerous false claims to Government Healthcare Programs for prescriptions beneficiaries had not agreed to fill at NuCare.

21

## IV.     **Government Billing Data**

125.     During the month of October 2019, some $65 million, $35 million, and

$4.5 million in medications were written by Dr. Webster, Dr. Meggs, and Dr. Lambert-

Doorn, respectively.

126.     Of these totals, the following table represents the amounts apparently

paid by Medicaid-funded programs.[6]

| | Qty. Rx | RxCost (total) | InsPaid (total) |
|---|---|---|---|
| **LAMBERT-DOORN, NAHESI DR.** | **5** | **$10,430.60** | **$7,010.57** |
| Excellus Health Plan, Inc.? | 1 | $2,459.96 | $1,256.12 |
| Healthfirst Medicaid Managed Care Plan | 2 | $2,109.64 | $1,340.96 |
| Healthfirst Medicaid Managed Care Plan* | 1 | $4,480.00 | $3,591.22 |
| Possibly NY Medicaid, possibly not | 1 | $1,381.00 | $822.27 |
| **MEGGS, LEONARD DR.** | **216** | **$370,046.36** | **$251,730.42** |
| CVS/Caremark: New York Managed Medicaid | 22 | $34,193.10 | $21,419.88 |
| Empire BlueCross BlueShield Health Plus* | 23 | $50,004.46 | $34,408.54 |
| Excellus Health Plan, Inc.? | 1 | $4,918.91 | $1,949.94 |
| Healthfirst Medicaid Managed Care Plan | 39 | $65,892.26 | $47,831.09 |
| HealthNow / BCBS WNY | 1 | $2,459.96 | $975.57 |
| Medicaid MetroPlus Health Plan | 26 | $41,506.55 | $27,039.45 |
| MetroPlus Health Plan | 1 | $2,991.00 | $1,943.40 |
| NY Medicaid? | 37 | $90,025.32 | $65,925.97 |
| Possibly NY Medicaid, possibly not | 22 | $47,083.32 | $31,866.88 |
| United Healthcare | 3 | $5,327.10 | $3,761.75 |
| United Healthcare Community Plan of New York | 29 | $7,198.38 | $1,555.84 |
| YourCare Health Plan | 12 | $18,446.00 | $13,052.11 |
| **WEBSTER, THOMAS** | **404** | **$867,701.86** | **$605,887.96** |
| CDPHP? | 8 | $28,119.26 | $22,283.84 |
| CVS/Caremark: New York Managed Medicaid | 14 | $33,298.44 | $21,568.78 |

---

[6] Note that, given the variety of managed care plans, this table is Dr. Yu's best understanding of which prescriptions were covered by Medicaid-funded programs, with the yellow highlighting indicating the plans that he is certain are Medicaid funded.

[.] Dr. Yu believes (but is not sure) that this prescription, and the Empire BlueCross BlueShield Health Plus prescriptions marked with an asterisk below, were paid for by a Medicaid-funded program.

| | Qty. Rx | RxCost (total) | InsPaid (total) |
|---|---|---|---|
| Empire BCBS? | 12 | $28,992.00 | $19,911.36 |
| Empire BlueCross BlueShield Health Plus* | 52 | $108,573.81 | $73,838.36 |
| Excellus Health Plan, Inc. | 11 | $19,214.36 | $11,701.84 |
| Fidelis Care | 4 | $3,787.22 | $2,488.98 |
| Healthfirst Medicaid Managed Care Plan | 42 | $69,973.96 | $50,447.78 |
| HealthNow / BCBS WNY | 9 | $34,225.39 | $27,285.84 |
| Medicaid MetroPlus Health Plan | 43 | $116,616.10 | $75,268.89 |
| MetroPlus Health Plan | 16 | $30,506.88 | $19,744.83 |
| MVP | 4 | $16,546.00 | $11,966.36 |
| NY Medicaid? | 64 | $205,025.76 | $151,963.11 |
| Possibly NY Medicaid, possibly not | 48 | $105,096.72 | $74,025.75 |
| United Healthcare | 2 | $3,754.50 | $2,793.58 |
| United Healthcare Community Plan of New York | 44 | $12,351.36 | $2,979.13 |
| YourCare Health Plan | 31 | $51,620.10 | $37,619.53 |
| **TOTAL** | | | **$864,628.95** |

127.    In addition, Dr. Yu has identified that Dr. Lambert, Dr. Meggs, and Dr. Webster have ordered some $3 million in medications for which NYSHIP paid $2.4 million in the month of October 2019 alone.

| | Qty. Rx | RxCost (total) | InsPaid (total) |
|---|---|---|---|
| **LAMBERT-DOORN, NAHESI DR.** | **24** | **$72,300.14** | **$57,541.98** |
| NYSHIP—New York State Health Insurance Program, Student Employee Health Plan (SEHP) | | | |
| **MEGGS, LEONARD DR.** | **270** | **$857,931.65** | **$671,734.63** |
| NYSHIP—New York State Health Insurance Program, Student Employee Health Plan (SEHP) | | | |
| **WEBSTER, THOMAS** | **629** | **$2,037,412.25** | **$1,589,993.63** |
| NYSHIP—New York State Health Insurance Program, Student Employee Health Plan (SEHP) | | | |
| **TOTAL** | | | **$2,319,270.24** |

23

128.    Finally, it appears that Dr. Lambert, Dr. Meggs, and Dr. Webster have ordered approximately $125,000 in medications for which UFT Welfare Fund paid some $75,000 during the month of October 2019.

|  | Qty. Rx | RxCost (total) | InsPaid (total) |
|---|---|---|---|
| LAMBERT-DOORN, NAHESI DR. | 1 | $2,991.00 | $2,383.31 |
| MEGGS, LEONARD DR. | 27 | $46,682.26 | $26,315.86 |
| WEBSTER, THOMAS | 39 | $76,548.25 | $46,110.63 |
| **TOTAL** | | | **$74,809.80** |

129.    In total, during the month of October 2019 alone, the Defendants Physicians wrote and NuCare billed Government Healthcare Programs for over 1,500 different false prescriptions for a total prescription cost of nearly $4.4 million and the various Government Healthcare Programs actually paid more than $3.2 million in false claims.

130.    Upon information and belief, October 2019 is not the first, nor the last, month Defendants operated this widespread fraudulent scheme.

131.    Indeed, NuCare maintains several locations in New York and the same owners — on information and belief, Millett and Bishoff — own (or have equity stakes) in other pharmacies across the country including in California, Illinois, and Texas.

132.    On information and belief, Defendant Saidazim conspired with Millett, Bishoff, and others in this scheme by, among other things, recruiting these doctors to provide these prescriptions that were submitted to the Government Healthcare Programs.

133.    Upon information and belief, this same, or a similar, scam is being run at multiple of these locations.

## CAUSES OF ACTION

### COUNT I – VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)
### (All Defendants)

134.    Plaintiff Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

135.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

136.    Defendants knowingly caused to be presented false or fraudulent claims for payment or approval to the United States for various medications that were not reasonable and necessary or were not actually dispensed and therefore were not reimbursable by the relevant Government Healthcare Programs.

137.    Defendants knew or should have known (as defined in 31 U.S.C. § 3801(a)(5)) that they had caused to be made false or fraudulent claims for payment to Government Healthcare Programs.

138.    Each of the claims caused to be submitted by Defendants is a separate false and fraudulent claim.

139.    Defendants caused to be presented these claims knowing their falsity, or in deliberate ignorance or reckless disregard that such claims were false.

140.    The United States was unaware of the foregoing circumstances and conduct of Defendants and, in reliance on said false and fraudulent claims, authorized payments to be made on the false claims Defendants caused to be made, made such payments, and has been damaged.

25

141.   Because of these false or fraudulent claims submitted or caused to be submitted by Defendants, the United States has been damaged in an amount to be determined at trial.

### COUNT II – Violation of 31 U.S.C. § 3729(a)(1)(B)
### (Against All Defendants)

142.   Plaintiff Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

143.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used false records or statements material to a false or fraudulent claim.

144.   Defendants knowingly and willfully violated the False Claims Act by making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.

145.   Specifically, for purposes of obtaining or aiding to obtain payment or approval of claims made to Government Healthcare Programs, Defendants made or presented, or caused to be made or presented, to the United States false or fraudulent records, knowing these records to be false or fraudulent, or acting with reckless disregard or deliberate ignorance thereof.

146.   Each medical record, Medication Order, bill, and invoice submitted to the government in support of Defendants' above-described false claims is a separate false record or statement and separate violation of 31 U.S.C. § 3729(a)(1)(B).

147.   The United States was unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent records,

26

authorized payments to be made to the Defendants, made such payments, and has been damaged.

148.    Because of these false or fraudulent statements submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

## COUNT III – VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)
### (All Defendants)

149.    Plaintiff Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

150.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the False Claims Act.

151.    Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to violate the False Claims Act.

152.    Defendants conspired to submit or cause to be submitted false and fraudulent claims related to the Medication Orders and associated bills described above.

153.    Defendants did in fact cause the submission of false and fraudulent claims for the false and fraudulent Medication Orders.

154.    As a consequence of their conspiracies, the United States paid these claims when it would not have but for Defendants' unlawful conduct.

155.    As a result of these conspiracies, and the resulting false or fraudulent claims submitted or caused to be submitted by Defendants, the United States paid the

claims, resulting in damages to the United States in an amount to be determined at trial.

### COUNT IV – Violation Of New York False Claims Act
### State Fin. Law § 189(1)(a)
### (All Defendants)

156.    Plaintiff Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

157.    Defendants violated State Finance Law § 189(1)(a) in that they knowingly presented, or caused to be presented, a false or fraudulent claim for payment.

158.    Defendants knowingly caused to be presented false or fraudulent claims for payment or approval to Government Healthcare Programs funded by New York State and/or New York City for various medications that were not reasonable and necessary or were not actually dispensed and therefore were not reimbursable by the relevant Government Healthcare Programs.

159.    All such monies were for use by New York State or New York City and the State and City were damaged by Defendants' conduct.

160.    The State of New York and New York City were unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent claims, authorized payments to be made on the false claims the Defendants caused to be made, made such payments, and have been damaged.

161.    Because of these false or fraudulent claims submitted or caused to be submitted by Defendants, the State of New York and New York City have damaged in an amount to be determined at trial.

**COUNT V – Violation Of New York False Claims Act**
**State Fin. Law § 189(1)(b)**
**(All Defendants)**

162.   Plaintiff Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

163.   Defendants violated State Finance Law § 189(1)(b) in that they knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim.

164.   Specifically, for purposes of obtaining or aiding to obtain payment or approval of claims made to Government Healthcare Programs, the Defendants made or presented, or caused to be made or presented, to the State of New York and/or New York City false or fraudulent records, knowing these records to be false or fraudulent, or acting with reckless disregard or deliberate ignorance thereof.

165.   Each medical record, Medication Order, bill, and invoice submitted to a Government Healthcare Program funded in whole or in part by the State of New York and/or New York City in support of the above-described false claims is a separate false record or statement and separate violation of State Fin. Law § 189(1)(b).

166.   The State of New York and New York City were unaware of the foregoing circumstances and conduct of Defendants and, in reliance on said false and fraudulent records, authorized payments to be made to Defendants, made such payments, and has been damaged.

167.   Because of these false or fraudulent statements submitted or caused to be submitted by Defendants, the State of New York and/or New York City paid the claims,

resulting in damages to the State of New York and New York City in an amount to be determined at trial.

## COUNT VI – Violation Of New York False Claims Act
### State Fin. Law § 189(1)(c)
### (All Defendants)

168.    Plaintiff Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

169.    Defendants violated State Finance Law § 189(1)(c) in that they conspired to submit false claims for presentment and make false statements material to the false claim.

170.    Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to violate the New York False Claims Act.

171.    Defendants conspired to cause to be submitted false and fraudulent claims related to the Medication Orders and associated bills described above.

172.    Defendants did in fact cause the submission of false and fraudulent claims for the false and fraudulent Medication Orders.

173.    As a consequence of their conspiracies, the State of New York and New York City paid these claims when it would not have but for Defendants' unlawful conduct.

174.    As a result of these conspiracies, and the resulting false or fraudulent claims submitted or caused to be submitted by Defendants, the State of New York and New York City paid the claims, resulting in damages to the State of New York and New York City in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff-Relator demands and prays that judgment be entered against Defendants, jointly and severally, as to the federal claims as follows:

A.     ordering that Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

B.     directing that each Defendant pay an amount equal to three times the amount of damages the United States has sustained because of such Defendant's actions;

C.     directing that each Defendant, pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, pay penalties of not less than $13,508 and not more than $27,018 for each such Defendant's violation of the False Claims Act;

D.     granting Relator the maximum amount allowed under 31 U.S.C. § 3729, and/or any other applicable provision of law;

E.     directing that each Defendant, jointly and severally, pay Plaintiff-Relator's fees and costs, including attorneys' fees, as provided by the False Claims Act;

F.     directing that each Defendant pay interest on all sums ordered paid;

G.     ordering that Relator recover such other relief as the Court deems just and proper; and

H.     granting such other and further relief as the Court deems just and proper.

**AND WHEREFORE**, Plaintiff-Relator demands and prays that judgment be entered against Defendants, jointly and severally, as to the claims under New York law as follows:

A.     ordering that Defendants cease and desist from violating the NYFCA;

B.     directing that Defendants pay an amount equal to three times the actual damages suffered by the State of New York and New York City and not less than $13,508 and not more than $27,018 for each such violation of the NYFCA, plus pre-judgment interest as appropriate;

C.     directing that Defendants pay Plaintiff-Relator's fees and costs,

including attorneys' fees, as provided by the NYFCA;

D.    granting Plaintiff-Relator the maximum amount allowed under New York State Fin. Law § 190 and/or any other applicable provision of law;

E.    directing that Defendants pay interest on all sums ordered paid;

F.    ordering that Relator recover such other relief as the Court deems just and proper; and

G.    granting such other and further relief as the Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a trial by jury.

Dated:  May 18, 2023
       New York, NY

                    POLLOCK COHEN LLP

                    By: */s/ Max Rodriguez*
                      Adam L. Pollock
                      Max E. Rodriguez
                    111 Broadway, Suite 1804
                    New York, NY  10006
                    Adam@PollockCohen.com
                    (212) 337-5361

                    *Counsel for Plaintiff Relator*